Paul E. DUMAS, Plaintiff-Appellant,

v.

Richard S. SCHWEIKER, Secretary of Health and Human Services, Defendant-Appellee.

No. 1053, Docket 82–6344.

United States Court of Appeals, Second Circuit.

Argued March 18, 1983.

Decided June 22, 1983.

John S. Hogg, Hamilton, N.Y., for plaintiff-appellant.

Frederick J. Scullin, Jr., U.S. Atty. for the Northern District of New York, Syracuse, N.Y., Nancy S. Jones, Asst. U.S. Atty., Northern District of New York, Syracuse, N.Y., of counsel, submitted a brief, for defendant-appellee.

Before MANSFIELD, MESKILL and NEWMAN, Circuit Judges.

MESKILL, Circuit Judge:

Paul E. Dumas appeals from an order of the United States District Court for the Northern District of New York, Munson, C.J., dismissing his complaint brought under section 205(g) of the Social Security Act (Act), 42 U.S.C. § 405(g) (Supp. IV 1980), and approving the determination of the Secretary of Health and Human Services (Secretary) that Dumas is not entitled to disability benefits. The questions presented are whether the Secretary correctly applied the appropriate legal standards governing disability determinations and whether substantial evidence supports the Secretary's determination that Dumas is not disabled. We affirm.

## BACKGROUND

Paul E. Dumas is 58 years old, married, childless, unemployed and in poor health. He has a ninth grade education and an employment record which includes military service, bartending, a job as a metal piler and, most recently, a highway superintendent position with the Town of Brasher Falls, New York. Dumas retired on April 15, 1977, after fifteen years with the Town, due to an array of physical and psychological ailments which rendered him unable to continue as highway superintendent.

Dumas applied for disability insurance benefits on May 26, 1977, claiming that he was unable to work because of high blood pressure and nerves. The Social Security Administration denied his application finding that while he suffered from essential vascular hypertension and diabetes mellitus, his impairment was "slight" and would not "impact upon normal work activities." Dumas petitioned for and was afforded a hearing before an Administrative Law Judge (ALJ) who affirmed the denial of his application. The ALJ's decision became a final order of the Secretary when affirmed by the Appeals Council on April 6, 1978. Thereafter, Dumas sought review of the Secretary's decision in the district court pursuant to 42 U.S.C. § 405(g) (Supp. IV 1980). Because the taped record of the first hearing had been lost, the district court remanded the case to the Secretary for a *de novo* hearing.

Dumas was the only witness to testify at the second hearing before the ALJ on October 5, 1979. He recited his employment history, education and family status and explained that he quit working because he "wasn't feeling very good" on account of a burning sensation in his feet, high blood pressure, hypertension and nerves. He complained of poor circulation which causes him problems with his hands: "They get cold and they get picky and they get numb. And the same way with my feet and legs. And I have these terrific pains in the back of my head and neck. And I have a very nervous condition." He also complained of

severe recurring headaches. He told the ALJ that he had last suffered a severe headache just four or five days before the hearing and that one week earlier he had suffered for three days from a headache so bad that "I couldn't even sit down, lay down, or walk. They come very quick and they leave very quick." When asked what he would do to relieve the pain, he responded: "Oh, I can't do nothing. Again, it's my nerves. Sometimes they're so severe, so severe that I can't even lay down or set down, or even stand up or walk. I just got to suffer with it till it goes."

Dumas has been relatively inactive since he retired in 1977. While his wife is at work during the day, he putters around the house and lawn and takes short walks, sometimes to a coffee shop not far from his home where he would "stop in and shoot the fat there with the boys." He can drive, but no farther than five to ten miles from home and not at night. He can walk, but for no more than 1500 to 1800 feet before his feet start to ache. He can stand, but only for ten to fifteen minutes before his legs start to ache. If he stoops to tie his shoes he becomes "awful dizzy." He can sit, but not for long or else his legs will "burn from [the] knees down" and his "feet will swell up." Dumas testified that he was unable to perform any gainful employment.

The ALJ considered a substantial amount of medical evidence in conjunction with Dumas' testimony. His Recommended Decision dated October 29, 1979, aptly summarized the medical record:

The medical evidence in this case begins with records of a hospitalization at Potsdam Hospital in April 1976 for severe headaches at which time his blood pressure was measured at 240/140 and moderate AV nicking was noted in the fundus. Medication for high blood pressure was prescribed. (Exhibit 15.) Records of Veterans Administration clinic visits between February and June 1977 show de-

tection of beginning neuropathy and retinopathy. However, the retinopathy was found to be mild at most. A renal scan showed no kidney abnormalities. Blood pressure was measured at 150/90, 120/100 and 170/120 at various times during this period. Because Mr. Dumas was obese (66 inches tall, 220 pounds) diet therapy was emphasized. (Exhibit 16.) In October 1977 Richard L. Hehir, M.D., an internist who treated the claimant at the Veterans Administration clinic, diagnosed high blood pressure, hypercholesterolemia, diabetes, peripheral arteriosclerotic heart disease and severe hand pain on exposure to cold as a result of this heart disease due to the nature of Mr. Dumas's job. . . .

Leon C. Benardot, M.D., a family practitioner who has treated Mr. Dumas since 1964, wrote in 1977 that the claimant had diabetes, hypertension, peripheral arteriosclerosis and obesity. He said that although he had treated Mr. Dumas for acute and chronic alcoholism in the past he is no longer drinking. Dr. Benardot also stated that the claimant is unable to continue his duties as highway superintendent. (Exhibit 19.) Dr. Hehir updated his report in June 1979 stating that "I must say that his condition has remained essentially unchanged, mild to moderate hypertension and diabetes both fairly well controlled." (Exhibit B-17.) George J. Fast, M.D., a psychiatrist, examined Mr. Dumas in September 1979 making a diagnosis of agitated depression which he said would prevent him from returning to his previous work where the claimant said he experienced much tension and pressure.

Administrative Tr. at 9–10.[1]

Upon the testimony and medical evidence the ALJ found that Dumas suffered from "hypertension and diabetes, mild to moderate, under fair control; occasional head-

---

1. Dumas testified to an assortment of medication that had been prescribed for his high blood pressure, diabetes and high cholesterol: Minipress, Hydrochlorothiazide, Mellaril, Dymelor, KCL Elixir and Apsormit-S. He had been prescribed Valium to treat his "depression, irritability, insomnia, anorexia and excessive worrying," but he feared the drug's addictive qualities.

aches and some circulatory problems." Nevertheless, he concluded that Dumas retained "a residual functional capacity to perform work related functions except work involving prolonged standing or walking, and prolonged exposure to cold weather." He found that while Dumas was unable to return to his former position with the Town of Brasher Falls, his impairments were not so severe that he was incapable of at least light work. In addition, Dumas had acquired skills from his past employment that the ALJ found could be transferred to other semi-skilled jobs. The ALJ expressly discounted Dumas' complaints of pain as "not to be of sufficient credibility to support a finding of disability by themselves or in combination with other conditions." The ALJ then turned to what is commonly known as the "Grid," a set of medical-vocational guidelines keyed to physical capacity to work. *See* 20 C.F.R. Part 404, Subpart P, App. 2 (1979). On the facts as found by the ALJ, the Grid mandated a finding of not disabled. After the Appeals Council affirmed the ALJ's Recommended Decision, Dumas sought review in the district court.

Because the medical-vocational guidelines that comprise the Grid did not become effective until February 1979, more than two years after Dumas sought disability benefits, the district court was concerned that the ALJ's retroactive application of the Grid might have been detrimental to Dumas. Prior to the Grid, the Secretary relied on the testimony of a vocational expert to determine whether a claimant who had been deemed unable to perform his past employment nevertheless retained the physical and vocational capabilities to perform other types of work. Accordingly, the district court remanded the case for a *de novo* hearing so that the Secretary could determine whether Dumas would have been disabled under the procedures in use prior to the Grid.[2]

A vocational expert was summoned to testify on remand. After reviewing all of the exhibits in the case, he testified that the skills Dumas had acquired in his past occupations were transferable to the job of time clerk. He further testified that there were 150 such jobs in the region in which Dumas resided and 112,000 such positions in the national economy. At this point in his testimony, the ALJ posed this hypothetical:

> ALJ: An individual with Mr. Dumas's vocational background, and considering his age and his education, and assume that he could only do sedentary work, could he do those jobs that you—
>
> Vocational Expert: In my estimation, yes.

Dumas then took the stand and explained that his condition had deteriorated since his testimony at the second hearing. His legs remained his "worst problem." With only minimal physical exertion they would swell and the resulting pain would spread into his groin and back. Although "[t]he blood pressure's been good," the headaches continued to bother Dumas: "Oh, my God, I'm so—I'm so that I can't even turn my head, I can't even sit down, and I lay down with a soft pillow, and even if I turn right or left it bothers me."

The ALJ issued his third Recommended Decision on June 16, 1981, again finding that Dumas was not disabled. Based on the vocational expert's testimony and Dumas' supplementary testimony, the ALJ concluded that Dumas retained the residual functional capacity for sedentary work, that he had acquired skills transferable to the job of timekeeper and that many such positions existed in the national economy. Soon after the Appeals Council adopted the ALJ's decision, Dumas sought review in the district court. On October 20, 1982, the district court affirmed, holding that there was

---

**2.** As an independent assertion of error, Dumas makes the argument that the district court arbitrarily subjected him to a unique double burden by first requiring him to prove disability under the procedures in effect prior to 1979, and then requiring him to prove disability under the Grid, which became effective on February 26, 1979. *See* 20 C.F.R. §§ 404.1501–.1598 (1982). His argument is unpersuasive because it is clear from the record that the Secretary found Dumas not to be disabled under both the new regulation and, independently, under the prior practice.

substantial evidence to support the Secretary's decision. Dumas then brought this appeal.

## DISCUSSION

To qualify for social security disability benefits, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A) (1976). A physical or mental impairment is not disabling unless it is "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) (1976).

■ The claimant bears the ultimate burden of proving that he is disabled. 42 U.S.C. § 423(d)(5) (Supp. IV 1980); *Aubeuf v. Schweiker,* 649 F.2d 107, 111 (2d Cir. 1981); *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). However, once the claimant demonstrates that he is unable to perform his past work because of his impairment, the burden shifts to the Secretary to prove the existence of other substantial gainful work in the national economy that the claimant can perform. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam); *Aubeuf v. Schweiker,* 649 F.2d at 112; *Dousewicz v. Harris,* 646 F.2d 771, 772 (2d Cir. 1981); *Parker v. Harris,* 626 F.2d at 231.

■ In evaluating the claimant's alleged disability, the Secretary must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and . . . educational background, age, and work experience." *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981); *Parker v. Harris,* 626 F.2d at 231. The Secretary's determination must be affirmed if supported by substantial evidence and not the product of legal error. 42 U.S.C. §§ 405(g), 1383(c)(3) (Supp. IV 1980); *Berry v. Schweiker,* 675 F.2d at 467;

*Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)); *see Aubeuf v. Schweiker,* 649 F.2d at 112.

### A. Prima Facie Case

■ A prima facie case of disability is established when the claimant shows that he is unable to perform his past employment because of his impairments. Dr. Benardot, Dumas' treating physician, submitted a letter to the Secretary in which he concluded that Dumas is unable to return to his former position with the Town of Brasher Falls. The opinion of a treating physician is entitled to great weight, *Parker v. Harris,* 626 F.2d at 231, and is conclusive in the absence of contradictory evidence, *Aubeuf v. Schweiker,* 649 F.2d at 112; *Hankerson v. Harris,* 636 F.2d 893, 896 (2d Cir. 1980). Dr. Benardot's brief letter recited the subjective complaints of his patient and listed his diagnoses: diabetes mellitus, hypertension, peripheral arteriosclerosis and obesity. While we are left in the dark as to the relationship between the doctor's diagnoses and his conclusion that Dumas "is unable to fulfill his duties as Town Road Superintendent," there is nothing in the record to contradict his opinion. Brasher Falls is located in cold, snowy, upstate New York. As highway superintendent for the town, Dumas was responsible for supervising snow removal, a task that presumably would require prolonged exposure to cold weather. Dr. Benardot stated that Dumas' "main complaints" were "easy fatiguability [sic] and pains in his hands and feet, especially when exposed to cold weather." Dr. Hehir of the Veterans Administration reported that Dumas complained of severe hand pain and anxiety upon exposure to cold weather. Dr. Hehir, "therefore, felt that it was not advisable to allow [Dumas] to continue at this job [of highway superin-

tendent], because of the physical effects on his circulation and because of the effects in producing anxiety in the patient." Finally, a psychiatrist who had once examined Dumas characterized his complaints as "psychosomatic" and concluded that because of the "depression, irritability, insomnia, anorexia and excessive worrying" that plagued Dumas, he could not be gainfully employed in the highway superintendent position. Substantial record evidence establishes that Dumas' circulatory problems were adversely affected by cold weather thereby causing him great pain in his hands and feet and producing severe anxiety. Because his previous job as highway superintendent was simply incompatible with his physical and mental impairments, the burden switched to the Secretary to establish that Dumas could nevertheless engage in other substantial gainful activity.

B. *Alternative Substantial Gainful Activity*

■ To rebut a prima facie case of disability, the Secretary must prove the existence of alternative substantial gainful activity in the national economy which the claimant is capable of performing. *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980). The Secretary's burden is twofold. First, he must show that "the claimant's impairment is of a kind that still permits certain types of activity, such as lifting or walking, necessary for other occupations, and that the claimant's experience involves skills transferable to other work." *Decker v. Harris,* 647 F.2d 291, 294 (2d Cir.1981); *see Ghazibayat v. Schweiker,* 554 F.Supp. 1005, 1007 (S.D.N.Y.1983). Thus, the Secretary must establish that the claimant has both the physical and the vocational capability to perform other work. 20 C.F.R. § 404.1546 & .1561 (1982). The regulations define physical ability in terms of "residual functional capacity." 20 C.F.R. § 404.1545 (1982). Vocational capability is assessed in light of the claimant's age, education and work experience, 20 C.F.R. § 404.1561 (1982), and involves an evaluation of the physical exertion the claimant is capable of and the vocational skills he possesses, 20

C.F.R. § 404.1567–.1568 (1982). The Secretary must then prove the existence in the national economy of jobs suited to the claimant's physical and vocational capabilities. *Decker v. Harris,* 647 F.2d at 294. On this issue, the Secretary will usually rely on the testimony of a vocational expert. 20 C.F.R. § 404.1566(e) (1982).

Dumas contends there is no substantial competent evidence to support the Secretary's finding that he retains despite his impairments the residual functional capacity to perform sedentary work. In his view, the Secretary ignored his psychiatric problems and his testimony of the severe pain he continually suffers. We disagree.

The medical record substantially supports the Secretary's findings. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a) (1982). The conditions that Dumas suffers are not in themselves disabling. He admittedly can perform the minimal motor functions necessary for sedentary work. He can sit, walk and stand, even if for only a limited span of time before the pain sets in, and he can apparently lift up to ten pounds. *Cf. Ghazibayat v. Schweiker,* 554 F.Supp. 1005, 1010 (S.D.N.Y.1983) (claimant could not sit for over five minutes and could not work on small objects on a table before him). Each of the three physicians who offered an opinion in this case concluded only that Dumas was unable to return to his prior employment with the Town of Brasher Falls. The evidence is that cold weather triggers the symptoms Dumas most often complains of—severe pain in the hands and feet—and contributes significantly to his anxiety. On the basis of the medical record, it is apparent that Dumas is capable of work not

involving prolonged standing or walking or exposure to cold weather. *Cf. Carroll v. Secretary of Health and Human Services,* 705 F.2d 638, 640, 643 (2d Cir.1983) (Secretary offered no evidence to rebut *physician's* conclusion that claimant had only a "limited ability" to stand or walk "for any period of time").

Yet Dumas maintains that persistent severe pain renders him incapable of performing *any* substantial gainful employment and he complains that the Secretary's findings to the contrary are not supported by substantial evidence. Dumas undoubtedly lives with pain. The medical record is replete with references to his complaints of headaches due to hypertension. "[S]ubjective *pain* may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence," *Aubeuf v. Schweiker,* 649 F.2d 107, 111–12 (2d Cir. 1981) (quoting *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)); *see Meyer v. Schweiker,* 549 F.Supp. 1242, 1246 (W.D.N.Y.1982), as long as the pain results from a "physical or mental impairment" as defined by section 223(d)(3) of the Act, 42 U.S.C. § 423(d)(3) (1976); *see Gallagher v. Schweiker,* 697 F.2d 82, 84–85 (2d Cir.1983).[3] But, disability requires more than mere inability to work without pain. To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment. Otherwise, eligibility for disability benefits would take on new meaning. The severity of pain is a subjective measure— difficult to prove, yet equally difficult to disprove. We must not constrain the Secretary's ability to evaluate the credibility of subjective complaints of pain, particularly where, as here, those complaints were not part of claimant's prima facie case. *Cf. Aubeuf v. Schweiker,* 649 F.2d at 110–11 (physician's conclusion as to disability rested in part upon pain resulting from severe back injury). There is abundant evidence in the record that Dumas suffered headaches. Yet, despite intensive medical surveillance over the past six years, there is no mention in the record of disabling headaches. Although Dumas now testifies to severe debilitating pain, the Secretary found that his complaints were not sufficiently credible alone or in conjunction with other evidence to support a finding of disability. Thus, the question is whether the Secretary's findings with respect to subjective complaints of pain are supported by substantial evidence.

Dumas was hospitalized in 1976 complaining of severe headaches and was diagnosed as suffering from severe hypertension. When admitted, his blood pressure measured 240/140. Since his hospitalization, however, his blood pressure has not reached such astronomical levels. In June 1979, Dr. Hehir of the Veterans Administration noted that Dumas' hypertension and diabetes have been "fairly well controlled." Although Dumas now complains of severe debilitating headaches, headaches did not factor significantly into any of the medical opinions concluding that Dumas was unable to return to his prior employment, including the opinion of Dr. Benardot who had treated Dumas for almost fourteen years.

Veterans Administration records of periodic examinations of Dumas during the years 1977 through 1981 suggest that his present complaints of pain are exaggerated. Although Dumas complained of headaches during every examination, he was usually more concerned about his other symptoms: on November 9, 1978, his "prime concern" was his "hands and feet;" on May 10, 1979, he "only verbalize[d] concern for hands and feet;" on June 21, 1979, his "prime concern [was] burning in hands and feet;" on April 2, 1980, his "major" complaint was "burning and numbness hands to wrists and feet;" and, again on April 2, the examiner noted that Dumas' "major concern [was] that [Social Security] Disability doesnot [sic] agree with his personal evaluation of work *in* capacity." At no point in the medical rec-

---

**3.** Since we conclude that substantial evidence supports the Secretary's finding that Dumas was not disabled by reason of pain, we need not consider whether his pain was shown to have resulted from a physical or mental impairment.

ord are his headaches described in such severe terms as he now employs. Indeed, he twice described his headaches as only infrequent. Supp. Administrative Tr. at 286, 295. Moreover, there is evidence in the record that Bufferin helped to relieve the pain. Supp. Administrative Tr. at 293–94.

■ The medical record reflects great concern among examining physicians over Dumas' hypertension and diabetes which they felt could cause major complications. However, the physicians were frustrated by Dumas' unwillingness to help himself. Of course, a remediable impairment is not disabling. *Ghazibayat v. Schweiker,* 554 F.Supp. 1005, 1011 (S.D.N.Y.1983); *cf. Coleman v. Califano,* 462 F.Supp. 77, 81 (N.D.N.Y.1978) (failure to heed doctor's diet recommendation); 20 C.F.R. § 404.1530 (1982). A consistent concern of the physicians was that obesity aggravated all of the symptoms reported by Dumas. On many occasions, the physicians noted that diet would help Dumas' hypertension and, as a result, his headaches. *See, e.g.,* Supp. Administrative Tr. at 293 (June 2, 1977), 294 (June 9, 1977), 295 (August 18, 1977), 286 (February 2, 1978), 283 (March 16, 1978), 279 (November 9, 1978), 275 (April 2, 1980). When examined on May 13, 1981, his weight remained the same as it had been when measured on June 9, 1977, that is, 220 pounds. Administrative Tr. at 90, Supp. Administrative Tr. at 253.

■ The question for our review is not whether the evidence preponderates in the Secretary's favor. "Congress has instructed us that the factual findings of the Secretary, if supported by substantial evidence, shall be conclusive. 42 U.S.C. §§ 405(g), 1383(c)(3)." *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982). In this case the Secretary's findings are well supported. The Recommended Decision of the ALJ, as adopted by the Secretary, reflects a complete and detailed recitation of the medical records and reports spanning the years 1976 through 1981; absent from the record is any indication of the severity of Dumas' pain. *See id.* at 63 ("report contained no objective findings to explain the headaches or to justify a claim of dis-

ability resulting from them"); *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981). The Secretary is entitled to rely not only on what the record says, but also on what it does not say. *Rutherford v. Schweiker,* 685 F.2d at 63; *Berry v. Schweiker,* 675 F.2d 464, 468 (2d Cir.1982) (per curiam). What the record does say is that severe medically determinable problems prevent Dumas from work that involves prolonged standing or walking or prolonged exposure to cold weather. Conspicuously absent from the record is any indication that Dumas continually suffered, prior to now, from headaches so devastating as to render him unable to work. The Secretary is entitled to rely on the medical record and his evaluation of claimant's credibility in determining whether claimant suffers from disabling pain. *Rutherford v. Schweiker,* 685 F.2d at 63; *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). Substantial evidence supports the conclusion that Dumas retains the residual functional capacity to perform sedentary work. *See Berry v. Schweiker,* 675 F.2d at 469; *Miles v. Harris,* 645 F.2d at 124.

■ Dumas also contends that the Secretary failed to sustain his burden of proving the existence of alternative jobs in the national economy that Dumas is capable of performing. At the third hearing before the ALJ, a vocational expert testified that Dumas had acquired skills in his prior employment that were transferable to the job of time clerk, a sedentary position which exists in great numbers in the national economy. He responded affirmatively to the ALJ's question whether "[a]n individual with Mr. Dumas's vocational background, and considering his age and his education, and assume that he could only do sedentary work, could he do those jobs[?]" Supp. Administrative Tr. at 213.

Dumas attacks the hypothetical posed by the ALJ because the vocational expert was asked to *assume* that Dumas was capable of sedentary work. He relies on *Aubeuf v. Schweiker,* 649 F.2d 107 (2d Cir.1981), to support his argument that a "vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can

realistically perform a particular job." *Id.* at 114. His reliance is misplaced. *Aubeuf* and other decisions critical of hypotheticals that ask a vocational expert to assume a particular physical capability on the part of the claimant all address situations where there was no evidence to support the assumption underlying the hypothetical. *See Aubeuf v. Schweiker,* 649 F.2d at 114 ("The hypothetical question ... incorporated the ALJ's conclusion with respect to pain which we have found to be based on an erroneous standard, and did not adequately account for Mr. Aubeuf's actual limitations."); *Gilliam v. Califano,* 620 F.2d 691, 693 (8th Cir.1980) ("The only evidence in the record to support the ALJ's finding that Gilliam could engage in substantial gainful activity is the testimony of the vocational expert."); *Meyer v. Schweiker,* 549 F.Supp. 1242, 1248 (W.D.N.Y.1982) (response to hypothetical which assumed that claimant's "impairments were not severe" is irrelevant where vocational expert had testified "that someone with [claimant's] impairments could not perform any alternate work"); *Brittingham v. Weinberger,* 408 F.Supp. 606, 614 (E.D. Pa.1976) (vocational expert's opinion meaningless "[u]nless there is record evidence to adequately support ... assumption" upon which opinion is based). As discussed earlier, there is substantial record evidence to support the assumption upon which the vocational expert based his opinion.[4] Consequently, his opinion that Dumas had acquired skills in prior work that were transferable to sedentary jobs abundant in the national economy satisfied the Secretary's burden of showing the existence of alternative substantial gainful employment suited to Dumas' physical and vocational capabilities.

Affirmed.

---

4. Because there was substantial evidence to support the Secretary's conclusion that Dumas retained the residual functional capacity for sedentary work, the ALJ rightfully removed that issue from the vocational expert's consideration. The vocational expert is just that, a vocational expert. The ALJ is responsible for determining, based on all the evidence, the claimant's physical capabilities. Dumas mistakenly argues that the vocational expert's negative response to the following hypothetical establishes his inability to perform gainful employment: "If you assume an individual like the claimant, his age, education, and experience, who is subjected to headaches of the character as he has testified to, unpredictably, at intervals of not more than 10 days or so, would he then be capable of doing the jobs which you've described?" Having discounted Dumas' assessment of the severity of his headaches, the ALJ was entitled to rely on the vocational expert's prior opinion that Dumas possessed the skills necessary to perform the job of timekeeper.