Connie S. RUHL, Plaintiff,

v.

Otis R. BOWEN, M.D., Secretary of the
Department of Health and Human
Services, Defendant.

No. 88–0111–CV–W–1.

United States District Court,
W.D. Missouri, W.D.

Feb. 21, 1989.

Daniel Devine, Kansas City, Mo., for plaintiff.

Judith M. Strong, Asst. U.S. Atty., Kansas City, Mo., for defendant.

## ORDER

WHIPPLE, District Judge.

This suit involves plaintiff's application under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*, for supplemental security income (SSI) benefits. Section 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3) provides for judicial review of a "final decision" of the Secretary of Health and Human Services to the same extent as provided in Section 205(g) of the Act, 42 U.S.C. § 405(g). The matter is before the court on the parties' cross motions for summary judgment.

Plaintiff's application was denied initially and upon reconsideration. After a hearing, an administrative law judge (ALJ) rendered a decision on September 18, 1987, finding that the plaintiff was not under a "disability" as defined in the Act. The Appeals Council denied plaintiff's request for review, so the ALJ's decision stands as the final decision of the Secretary.[1]

1. Although plaintiff's application under Title II of the Act for disability benefits also was denied, plaintiff has not disputed the ALJ's finding that she is not entitled to disability benefits under Title II.

## I. *Statement of Facts*

Plaintiff filed her application on September 15, 1986, alleging a disability due to hypertension beginning in 1976. Between September 1976 and February 1980, plaintiff gave birth to three children. Her first pregnancy was terminated early because of uncontrolled hypertension, and the infant died several days after birth. Physicians at Truman Medical Center consistently reported that her blood pressure was adequately controlled while on medication. When she was removed from medication during a pregnancy, however, plaintiff's hypertension became uncontrolled.

From May 5, 1983, to May 27, 1983, Nathaniel Winer, M.D., treated plaintiff as an in-patient at Truman Medical Center for hypertensive crisis, including headaches, blurred vision, and a heart murmur. Dr. Winer's notes indicate plaintiff had a known history of uncontrolled hypertension with a strong family history of hypertension. Plaintiff's blood pressure was controlled with medication and the visual difficulties and heart murmur improved. Dr. Winer stated in his report that plaintiff's blood pressure could be fairly adequately controlled by using antihypertensive therapy, but that her main problem was that she had not been taking medication for a year prior to hospitalization. Plaintiff said she was unable to buy the medications, so arrangements were made for her to obtain free Clonidine and Dyazide.

Out-patient records from the medical center also show that from August 21, 1985, to July 17, 1986, plaintiff's hypertension ranged from uncontrolled to poorly controlled to marginally controlled to adequately and well controlled. Plaintiff was taking Clonidine, Dyazide and, beginning on December 12, 1986, Hydralazine. Plaintiff did not complain of side effects of the medication and, at least once, her physicians questioned her compliance with the treatment. After April 25, 1986, plaintiff's hypertension was controlled consistently.

Dr. Winer stated on July 23, 1986, that the Catapres (Clonidine) caused plaintiff to be drowsy and would interfere with her ability to perform sedentary work or work around machinery. On August 15, 1986, the medical center records indicated plaintiff was doing well and her hypertension was under good control.

Shun–Min Wu, M.D., performed a consultative evaluation on October 14, 1986. Plaintiff reported hypertensive symptoms of a headache on the left side, radiating to her neck, which was relieved by Tylenol. She also complained of drowsiness caused by medications. Although she reported shortness of breath with exertion, and occasionally at night, she had been smoking a package of cigarettes daily since age 18. Examination revealed blood pressure of 140/90 while sitting, 130/100 while standing, but otherwise unremarkable. Dr. Wu concluded that plaintiff's blood pressure had been under "reasonably good control" on Clonidine, Hydralazine and Dyazide. From January 15, 1987, through April 24, 1987, plaintiff complained of cold and flu symptoms which eventually cleared, and occasional orthostatic lightheadedness. Her hypertension remained under adequate control. The diagnosis was hypertension due to primary aldosteronism.

Dr. Winer wrote on April 24, 1987, that plaintiff had severe hypertension and suffered mild congestive heart failure during an admission to the medical center. Dr. Winer believed that the dosage of medication required to control the plaintiff's condition would cause drowsiness which would impair her ability to perform activities, especially repetitive tasks, and would substantially interfere with her ability to sustain gainful employment.

Plaintiff's blood pressure was well controlled by May 1, 1987, and her physicians were tapering her use of Clonidine. On May 6, 1987, she suffered Clonidine withdrawal, resulting in uncontrolled hypertension. Frank Slovick, M.D., admitted plaintiff to the medical center, and her condition was brought under control there. Dr. Slovick indicated that plaintiff's diagnosis was primary hyperaldosteronism and said a CT scan had revealed a tumor on the left adrenal gland. Later it was determined that surgery on the tumor would not improve her condition.

Plaintiff's hypertension remained under control on May 8, 1987, but she complained of drowsiness. She continued to reduce her dosage of Clonidine, but began having increased blood pressure on June 6, 1987. The dosage was increased to 0.4 mg. three times daily (0.12 mg. daily). Plaintiff also took 250 mg. of Aldactone daily. Plaintiff's hypertension remained under control through June 26, 1987, when she took 300 mg. of Aldactone twice daily and 0.8 mg. of Clonidine once daily.

At the June 16, 1987, hearing, plaintiff testified she had completed the eighth grade, but that she had difficulty reading, spelling and pronouncing words. She said she had a job putting labels on bottles. Later she was employed as an assembler at a plastics company operating a punch press to make vests for safety personnel. She quit that job about 1975 or 1976, when she lost her first child. She bore other children and, due to child-care duties, did not return to employment.

Plaintiff said her first hypertensive crisis occurred in 1983 but claimed that she always had taken her medication. She said she had no idea why Dr. Winer attributed the crisis to noncompliance with her medication. The symptoms, which allegedly began in 1983, included drowsiness, blackouts, headaches two or three times weekly, blurred vision, dizziness when bending over or standing up quickly, and shortness of breath. Her last blackout had occurred around Christmas 1986.

Plaintiff's daily activities included attending to the laundry, cooking, sweeping, vacuuming, grocery shopping, taking her children to church, and visiting friends. She would walk unaided to the grocery store three blocks from home. She estimated doing about 50 percent of the housework and cooking, but said she tired easily, napped often (at least twice daily—and sometimes three or four times—for about 1.5 hours each) and dozed the rest of the day. She testified that she would get tired easily if she were moving around, rather than sitting, and thus would not nap less when active.

Plaintiff also testified that she had headaches two to three times weekly, starting in the temples and radiating into the neck and shoulders. She further said she had dizzy spells, shortness of breath, and had to rest after walking a block or two.

Plaintiff's husband testified that plaintiff napped once or twice daily for 1.5 to 2 hours each. Her husband also recalled two blackouts, one during the previous winter (1986–1987) and one during the previous summer after she had helped paint the house. Plaintiff's husband also testified that plaintiff did not sleep so often when she was working outside or when she was more active. Plaintiff's sister noted that she frequently calls by telephone, and visits weekly, and that plaintiff sleeps much of the time.

Vocational expert Patricia L. Perdaris reviewed the evidence and observed plaintiff at the hearing. In response to a hypothetical question which assumed plaintiff's age, education, and former work experience, in addition to assuming that all plaintiff's testimony were true, the expert testified that plaintiff could do no work because of her frequent naps. The ALJ posed a second hypothetical question which again assumed plaintiff's age, education, former work experience, but included limitations of drowsiness preventing the performance of sedentary jobs, work around unprotected heights and dangerous machinery, and commercial driving. The expert responded that plaintiff could not perform her former job of punch press operator because it involved work around machinery. However, the expert said other work existing in significant numbers in the economy would be available, including jobs as an electronics assembler, hand packer and auto machine operator.

## II. *Discussion*

To establish entitlement to supplemental security income benefits, plaintiff must show she is unable to engage in substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A).

The ALJ found that plaintiff had the following conditions:

controlled hypertension probably secondary to controller hyperaldosteronism and possible benign adenoma (not medically confirmed), mild bronchospastic or chronic bronchitic disease secondary to cigarette smoking with a productive cough and without symptoms such as shortness of breath, and side effects of medication necessary to control [her] hypertension and probable hyperaldosteronism[.]

The ALJ believed that plaintiff's allegations of drowsiness so severe as to require frequent naps were not credible, but found that the drowsiness from medications would prevent plaintiff from performing sedentary work, work around dangerous moving machinery or at unprotected heights, or commercial driving.

The ALJ mentioned the adrenal tumor as having not been medically confirmed. Indeed, the record contains no first-hand report or test results concerning the tumor. However, whether the ALJ was accurate in that regard is of no consequence here. First, the hypertension could be controlled by medication, and the report of a tumor included the observation that surgery would not improve plaintiff's condition. Second, the presence of a tumor, alone, would not establish a disability.

Plaintiff would need to show that, due to the tumor, she was unable to work. The only apparent effect of the tumor, if any, is hypertension. As stated above, medication apparently can control the hypertension if the medication is taken as prescribed. Dr. Wu said plaintiff's hypertension had not produced any significant end-organ damage. Further, there is no suggestion that plaintiff's condition was progressive or life-threatening.

■ An impairment which can reasonably be controlled by medication cannot form the basis for a finding of disability. *Barajas v. Heckler*, 738 F.2d 641, 644 (5th Cir.1984); *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2nd Cir.1983); *Whaley v. Gardner*, 374 F.2d 9, 11 (8th Cir.1967). Thus, if plaintiff can control the hypertension and the affects of the tumor, if any, with medi-

cation then the condition which can be controlled cannot be considered a disability.

■ The ALJ recognized that plaintiff suffered some drowsiness as a side effect of the antihypertension medication. The ALJ evaluated these subjective complaints according to the criteria set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984), and found that the plaintiff's drowsiness was not as severe as alleged and would not prevent her from working. Under *Polaski*, the ALJ must consider the evidence presented with regard to the claimant's prior work record, and observations of third parties and physicians regarding such matters as daily activities; the duration, frequency and intensity of pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication, and functional restrictions. If there is inconsistency in the record as a whole, the ALJ may disbelieve subjective complaints. *Polaski, supra*, 739 F.2d at 1322. As long as an explicit credibility finding is made, it is within the province of the ALJ to decide whether to believe the subjective complaints. *Taylor v. Bowen*, 805 F.2d 329, 331 (8th Cir.1986); *Tucker v. Heckler*, 776 F.2d 793, 796 (8th Cir.1985).

■ In this instance, the medical evidence supports a conclusion that the hypertension can be controlled by medication. The record also contains evidence supporting a conclusion that the side effects of the medication, i.e., drowsiness, is not substantial enough to compel a finding of disability. The evidence, to be sure, includes testimony that plaintiff naps frequently. However, she carries on a wide range of household chores, including gardening and assistance in painting the house. This certainly is consistent with the vocational expert's testimony that a person in plaintiff's condition could engage in light work. Of course, the treating physician's opinion on the ultimate issue of disability was that plaintiff was disabled, but that opinion is not conclusive. *Ward v. Heckler*, 786 F.2d 844, 846 (8th Cir.1986); *Vasquez v. Schweiker*, 701 F.2d 733, 736 (8th Cir.1983). Curiously, Dr. Winer's comment can be reconciled with the opinion of the ALJ and

vocational expert because Dr. Winer said merely that plaintiff's drowsiness would impair her ability to perform sedentary work or work around machinery. That opinion does not exclude light work which is not sedentary or near machinery.

The less severe limitation imposed by drowsiness can be found elsewhere in the record. For instance, the medical reports compiled in plaintiff's numerous and frequent visits to the medical center contain only one reference to drowsiness. The ALJ reasonably inferred that if drowsiness were as severe a problem as plaintiff said, there would have been more complaints to her physicians. In *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir.1987), the Eighth Circuit Court of Appeals held that district courts should consider (1) whether, according to *Polaski*, the Secretary considered all of the evidence relevant to claimant's complaints of pain, and (2) whether the evidence contradicted the complaints. Such consideration must be used, as it was here, to discount a claimant's testimony for lack of credibility.

Plaintiff's failure to complain contemporaneously to her physicians about drowsiness contradicts the testimony of the plaintiff, her father and her sister. An alternative theory, i.e., that besides being somewhat drowsy plaintiff *chooses* to nap at times she might otherwise choose to remain awake, is as plausible as plaintiff's theory that she cannot control her napping. The husband's suggestion that plaintiff naps less when she is more active, e.g., when gardening, supports that finding. Thus, that consistent theory can find substantial basis in the record, so there is substantial evidence to support the ALJ's conclusion that plaintiff is not disabled.

### III. *Conclusion*

In response to the ALJ's hypothetical question, the vocational expert was able to identify jobs which someone in plaintiff's situation reasonably could perform. The ALJ's hypothetical question discounted plaintiff's testimony regarding her need to take naps and, as discussed above, he could discount such testimony under the circumstances. The hypothetical question need only contain those impairments accepted as true by the ALJ. *Roberts v. Heckler*, 783 F.2d 110, 112 (8th Cir.1985); *Baugus v. Secretary of HHS*, 717 F.2d 443, 447 n. 5 (8th Cir.1983).

If plaintiff would be able to perform jobs existing in the national economy, as the ALJ found, she cannot be considered disabled within the meaning of the Social Security Act. There is substantial evidence in the record to support the ALJ's finding, so the Secretary's decision cannot be disturbed.

It is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that defendant's motion for summary judgment is granted. It is further

ORDERED that judgment shall be entered in favor of defendant and against plaintiff. The parties shall bear their own costs.