**Clarence B. HAUK, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant.**

**Civ. No. 94–2475–KHV.**

United States District Court, D. Kansas.

July 27, 1995.

Jean C. Owen, Law Office of Jean C. Owen, Overland Park, KS, for plaintiff.

Christina L. Morris, Office of U.S. Atty., Kansas City, KS, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This case comes before the Court on Clarence B. Hauk's motion seeking summary reversal or remand of the Commissioner's denial of disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (Doc. # 9). The Commissioner requests an order affirming the denial of benefits. (Doc. # 11).

### FACTUAL BACKGROUND

Claimant, Clarence B. Hauk, is a 46-year-old man with a high school education and one year of college. Hauk claims that because of various disabling conditions, he has been unable to work since July 22, 1990. His past relevant employment was as a truck driver, school bus driver and youth services trainee.

Since childhood, Hauk has suffered from esotropia (crossed eyes) leading to diplopia (double vision). He has undergone two surgeries in an attempt to correct the problem, the first when he was ten years of age and the second in 1989, with little success. Hauk complains of constant eye pain, for which he takes medication that helps "some." He also has blurred vision when both eyes are open. To see clearly, he shuts one eye and uses the other, almost exclusively closing his right eye (which has 20/30 vision) to see through his left (which has 20/20 vision). Hauk's visual efficiency tests 66 percent in his left eye and 54 percent in his right.

Hauk has also been diagnosed with asthma, chronic lower back pain resulting from degenerative disc disease at L5–S1, carpal tunnel syndrome, depression, benign positional vertigo, mood swings, memory problems, impulse control problems and marked degenerative changes in his right elbow. Hauk has received treatment for these conditions but continues to complain of symptoms. He also reports memory difficulties, disorientation and confusion. These problems have been confirmed by an examining psychologist who noted in 1992 that these problems appeared to preclude Hauk from working at that time but that Hauk seemed able to understand simple and intermediate instructions and concentrate on them for four to eight hours at a time.

In May 1990 Hauk received a blow to his left temple, which allegedly increased his eye pain and led to head and neck pain. Hauk also complains of constant watering eyes, fatigue, shortness of breath, and numbness in his knees, arms and hands.

Hauk filed an application for Social Security Disability Insurance benefits on December 27, 1991. (Tr. 63–65). When his request was denied, he appealed and had a hearing before an Administrative Law Judge (ALJ) who determined that Hauk was not disabled. (Tr. 19–24). The Appeals Council of the Department of Health and Human Services denied Hauk's request for review. (Tr. 3–4). Thus the ALJ's decision stands as the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481 (1994).

### STANDARD OF REVIEW

This court's review of the Commissioner's decision is limited to determining whether her findings are supported by substantial evidence and whether she applied correct legal standards in making her decision. *Hargis v. Sullivan,* 945 F.2d 1482, 1486 (10th Cir.1991). To the extent that the Commissioner's factual findings are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g) (1988). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hargis,* 945 F.2d at

1486; *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Fowler v. Bowen,* 876 F.2d 1451, 1453 (10th Cir.1989). Substantial evidence must be "more than a mere scintilla," *Richardson,* 402 U.S. at 401, 91 S.Ct. at 1427, but may be less than a preponderance, *Flint v. Sullivan,* 951 F.2d 264, 266 (10th Cir.1992). The Court's duty is not to reweigh the evidence, however, or substitute its decision for that of the ALJ. See *Hamilton v. Secretary of Health and Human Servs.,* 961 F.2d 1495, 1500 (10th Cir.1992); *Fowler,* 876 F.2d at 1453; *Hargis,* 945 F.2d at 1486.

## DISCUSSION

■ Hauk has the burden of proving disability under the Act. *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989). "Disability" is defined in the Act as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. 42 U.S.C.A. § 423(d)(1)(A) (1995). The law states,

An individual shall be determined to be under a disability only if his physical impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C.A. § 423(d)(2)(A).

To determine whether a claimant is under a disability, the Secretary applies a five-step sequential evaluation: (1) whether the claimant is currently working, (2) whether the claimant suffers from a severe impairment or combination of impairments, (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation, (4) whether the impairment prevents the claimant from continuing his past relevant work, and (5) whether the impairment prevents the claimant from doing any kind of work. 20 C.F.R. §§ 404.1520, 416.920 (1994).

In applying this analysis, the ALJ found at step 3 that Hauk did not have an impairment or combination of impairments meeting or equaling the level of severity of any impairment described in Appendix 1, Subpart P, Regulation No. 4. Proceeding to step 4, the ALJ concluded that Hauk was unable to return to his past relevant work as a truck driver due to the severity of the combination of his medically determinable impairments. At step 5, the ALJ ruled that Hauk was still was capable of performing most unskilled light work. (Tr. 22, 23).

■ When the ALJ decides that a claimant is not able to perform his past relevant work, the burden shifts to the Commissioner to prove that the claimant can perform other work existing in the national economy. *Talbot v. Heckler,* 814 F.2d 1456, 1460 (10th Cir.1987); *Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir.1984). Hauk contends that the ALJ did not meet this burden.

■ The first branch of Hauk's argument is that the ALJ erred in using the medical-vocational guidelines, 20 C.F.R. § 404, subpt. P, app. 2 ("grids") to conclude that he was not disabled. The grids, which were developed to aid in the determination of social security disability claims, factor in a claimant's residual functional capacity, age, education and work experience and lead to a result of disabled or not disabled. *See* 20 C.F.R. § 404, subpt. P, app. 2 (1994). Resort to the grids is only appropriate, however, when these characteristics exactly fit a listing in the grids. 20 C.F.R. § 404, subpt. P, app. 2, § 200.00(a)-(b); *Gossett v. Bowen,* 862 F.2d 802, 806 (10th Cir.1988).

■ Typically, problems that arise with this "exact fit" requirement relate to residual functional capacity, *see Channel,* 747 F.2d at 579, and this case is no exception. RFC, which is determined by the ALJ, is basically a measure of exertional capacity, *i.e.* strength. *Huston v. Bowen,* 838 F.2d 1125, 1131 (10th Cir.1988). It describes the maximum sustained level of work a claimant is

capable of performing. *Channel*, 747 F.2d at 578. The ALJ must make his RFC decision based on all the evidence, including statements by treating physicians and psychologists. 20 C.F.R. §§ 404.1546, 404.1561.

The ALJ found that Hauk was capable of most light work, with the exception of commercial driving jobs. (Tr. 23). Light work is defined in the regulations as:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b) (1994). In so concluding, the ALJ reasoned that (1) Hauk's subjective complaints of pain and other symptoms are exaggerated and therefore not credible, (2) Hauk's mental and emotional problems are not severe, and (3) Hauk has sufficient visual acuity to do most unskilled labor. (Tr. 21, 23). The ALJ also relied on Hauk's daily activities, asserting that they are "clearly consistent with performing a range of light work." (Tr. 21).

Hauk's complaint about the application of the grids concerns the ALJ's analysis of his nonexertional impairments, including pain, vision limitations, and mental and emotional problems, in determining Hauk's RFC. Hauk argues that the ALJ did not adequately address the effect of these impairments on Hauk's RFC and that the ALJ's credibility finding was not supported by substantial evidence. Finally, Hauk asserts that the ALJ had insufficient medical or vocational evidence upon which to base an RFC finding, and the ALJ therefore failed his duty to fully and fairly develop the administrative record.

 It is well recognized that when a claimant's ability to work at a certain RFC level is limited by nonexertional impairments, conclusive application of the grids is not appropriate. Social Security Act § 223(d)(5)(A), as amended, 42 U.S.C.A. § 423(d)(5)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir.1993); *Gossett*, 862 F.2d at 806 (10th Cir.1988). When this is the case, the ALJ must give "full consideration" to "all of the relevant facts of the case." *Channel*, 747 F.2d at 579 (citing 20 C.F.R. pt. 404, subpt. P, app. 2 § 200.00(a)-(b)). *See Thompson*, 987 F.2d at 1488 (10th Cir.1993). However, if the ALJ determines that a claimant's allegations of pain or other nonexertional impairments are not fully credible, and therefore insignificant, he can invoke the grids. *See Castellano v. Secretary of H.H.S.*, 26 F.3d 1027, 1030 (10th Cir.1994); *Huston*, 838 F.2d at 1132. Mere inability to work without pain does not prove disability. "To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment." *Brown v. Bowen*, 801 F.2d 361, 362–363 (10th Cir.1986) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983)).

 Because the ALJ, as the trier of fact, has the opportunity to observe the demeanor of the claimant, considering his testimony in light of how it is said and how it meshes with other evidence, the ALJ's credibility findings are traditionally given special deference. *Williams v. Bowen*, 844 F.2d 748, 755 (10th Cir.1988) (citing *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir.1978)). However, the ALJ must sufficiently support such decisions with substantial evidence. *Huston*, 838 F.2d at 1132; *Talbot v. Heckler*, 814 F.2d 1456, 1461 (10th Cir.1987) (citing *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir.1983)). Some factors to consider when making a credibility finding include:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of an relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Huston*, 838 F.2d at 1132.

In his credibility analysis, the ALJ relies on several of the above factors, including

medical evidence, side effects of medication, and daily activities. In his brief, Hauk attacks the ALJ's conclusions concerning his daily activities and his attempts to get medical help.

Hauk's argument that the ALJ mischaracterizes his daily activities has merit. The ALJ wrote, "[C]laimant's acknowledged activities of daily living further undermine any complaint of severe, disabling pain, and are clearly consistent with performing a range of light work." (Tr. 21). In another section of his opinion the ALJ elaborates on this: "Claimant ... described a good level of daily activities, including driving his car, going fishing and hunting, and collecting antiques. He is also able to watch television." (Tr. 20). These statements do not accurately reflect Hauk's testimony. Particularly, though Hauk wrote in a 1991 Disability Report that he collects coins and antiques and likes to hunt and fish (Tr. 104), during the hearing he testified that he had not been hunting in years (Tr. 60), that he gave up collecting antiques after his divorce in 1991 and no longer has the physical ability to carry them or take much care of them (Tr. 56), and that he can no longer see the numbers on coins (Tr. 56). He also stated he does not drive very often and that he usually gets someone to take him where he needs to go. (Tr. 39). Finally, he testified that he is only able to watch television for short periods of time before he needs to get up and move around. (Tr. 52).

In spite of these potentially inaccurate findings by the ALJ, substantial evidence to support the credibility finding does exist in the medical records. For instance, in December 1991 one of Hauk's treating physicians, Dr. Hagan, filled out a disability report stating that Hauk suffered from anxiety, esotropia, benign positional vertigo, and fatigue due to depression. However, the doctor believed that other than these conditions, Hauk was in general good health. (Tr. 137). This opinion is significant, given the fact that the doctor's records show that Hauk had complained of shortness of breath and numbness in his hands, arms and wrists. (Tr. 138). Medical records from the clinic where Dr. Hagan practiced also show that a month

before Dr. Hagan filled out the disability form (on which Dr. Hagan stipulated that Hauk should only work in a protected environment such as a sheltered workshop), a doctor noted that other than the vertigo and bronchitis, "probably most of symptoms are fractional," *i.e.* insignificant. (Tr. 138). The other symptoms reported at that time included shortness of breath with activity, fatigue and depression. Medical records from a few months later indicate that Hauk's vertigo was controlled by Meclizine. (Tr. 136).

Hauk has been diagnosed with asthma, but is on several medications which help his breathing "some." (Tr. 44). He nonetheless has continually complained of shortness of breath upon exertion. No physician has proclaimed this to be a severe impairment, however, and, as stated above, one doctor has expressed an opinion that this symptom appears to be "fractional." (Tr. 138).

Hauk has reported to doctors that his back pain began in 1980 when he injured it lifting a heavy object. (Tr. 169). He reinjured it in two separate car accidents, both of which apparently occurred while he was still working. (*Id.*) If a claimant has worked with an impairment, it is not disabling absent significant deterioration. *See, e.g., Schroder v. Sullivan,* 796 F.Supp. 1265, 1270 (W.D.Mo.1992). Also, while an X-ray showed "some" degenerative disc disease (Tr. 172), it was otherwise unremarkable (Tr. 172), and other medical tests demonstrated that Hauk was able to move his neck freely without restrictions. The doctor who performed these tests noted that Hauk was "quite guarded in every motion" but that he had a free range of motion in his extremities. (Tr. 170). He had no muscle spasms and a straight leg raising test was also normal. (*Id.*).

Hauk complains of needing to lie down and take naps two or three times a day, yet he has not discussed this with his doctors and none of the medical records indicate a need to lie down. Contrary to Hauk's assertion in his brief, the medical evidence does not link claimant's fatigue to his asthma and even if it did, fatigue and sleepiness are different symptoms. Therefore, the ALJ was justified in believing that Hauk had no medical need

to take naps and could have chosen just as easily to remain awake. *See Schroder,* 796 F.Supp. 1265, 1270 (W.D.Mo.1992).

Although Hauk has often complained to his doctors about pain and numbness in his arms, hands and elbows, substantial evidence supports the ALJ's finding regarding the seriousness of the condition. First of all, Hauk has received little in the way of treatment (pain medication and wrist braces), and his most significant diagnosis—carpal tunnel syndrome—occurred only two months before his hearing, though he had complained of the same symptoms for at least two years. This evidence indicates that his doctors did not consider these ailments severe. Also, in a 1992 pain questionnaire, Hauk reported that he did light housework, including dusting, washing dishes and doing laundry. (Tr. 99). He has also stated that he drives on occasion. Each of these tasks requires arm and hand strength and mobility. Finally, as previously discussed, Hauk had a free range of motion in his extremities. (Tr. 170).

Hauk also asserts that he suffers from severe eye pain. This is supported by subjective evidence in the form of medical records, a pain questionnaire and his testimony at trial. Though plaintiff testified that he had eye pain while working, he claims the pain worsened when he received a blow to the temple in 1990. However, in reviewing medical records from 1991, the Court finds no mention of this eye pain. During 1992, Hauk made more complaints of the eye pain, but early in 1993, when he apparently began taking Feldine, Hauk told his doctor that he had a much lower level of pain, and he did not request or receive more medication. (Tr. 175). This evidence supports the ALJ's finding that while Hauk apparently had some eye pain, it was not disabling.

 Hauk's depression has been noted by several doctors, and he has taken medication to relieve it.[1] No doctor has opined that Hauk's depression is severe, however, and one reviewing psychologist stated that Hauk's mental impairments did not appear severe. (Tr. 77). Only when a mental impairment is severe must it be included in the RFC analysis. *See Hargis v. Sullivan,* 945 F.2d 1482, 1488 (10th Cir.1991).[2]

Although he claims memory, attention, and concentration problems and one psychologist felt these would be a barrier to working at the present time (Tr. 155–156), another medical consultant noted that there was no evidence of an organic incident or event and that these reported problems did not present a problem for him occupationally, *i.e.* he never lost a job because of these difficulties. (Tr. 77).

Similarly, the ALJ's finding regarding Hauk's impulse control disorder—that the impairment does not prevent Hauk from working—is supported by substantial evidence. For instance, though Hauk has a pattern of explosive behavior that has caused relationship problems for him, he has never lost a job because of it. In addition, he attended two twelve-week seminars on anger control, which he claims did not help, though a therapist at the center wrote that Hauk was open about his difficulties with anger and that he "appeared to learn a great deal about relating respectfully and openly with other people." (Tr. 128). An examining psychiatrist expressed the opinion that Hauk does not offer any threat to people around him unless directly provoked and that he seems to be able to leave the scene before losing control. (Tr. 129–130). Expressing a similar opinion, a psychologist reported that Hauk should be able to function minimally with coworkers. (Tr. 155). This same specialist also opined that Hauk "appears able to understand simple and intermediate instructions, and ... concentrate on such instructions for a 4-hour or perhaps 8-hour time span." (*Id.*).

---

1. At the time of the hearing, Hauk had a current prescription for depression medication (Zoloft), yet he stated he had quit taking it because he could not afford it. He also testified that he had recently received a medical card, however, so the Court assumes that Hauk had access to the medication at the time of the hearing.

2. However, when a claimant suffers from a combination of impairments, mental impairments that are not sever by themselves must be evaluated together with the other impairments. Id. at 1491. The ALJ's evaluation of the combined effect of Hauk's impairments is addressed later in this opinion.

In determining the severity of any limitations imposed by Hauk's vision problems, the ALJ relied heavily on Hauk's daily activities, stating that they require good vision and "demonstrate that claimant has sufficient visual acuity to do most unskilled labor." (Tr. 21). As discussed previously, the ALJ misconstrued the nature and extent of Hauk's daily activities as they relate to Hauk's ability to continuously perform light work. Nonetheless, this error does not invalidate the ALJ's findings concerning Hauk's vision problems.

■ When using Hauk's daily activities to support his finding that Hauk did not suffer disabling pain, the ALJ implied that Hauk performed the activities on a daily basis and thus could perform a full range of light work. However, as Hauk describes his activities, they were very minimal. It is improper to rely on such limited activities to justify a conclusion that a claimant has the capacity to do a full range of work on a continual basis. *See Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir.1988). The questions presented by Hauk's vision limitation are different. They concern not Hauk's ability to sustain a light work level on a continual basis but rather his visual acuity—whether he can see well enough to perform most light work activities. Thus, it is significant that Hauk is able to watch TV and drive. Hauk also testified he has renewed his driving license in the last few years (Tr. 37), *i.e.* after his failed eye surgery in 1989.

Furthermore, during the course of his hearing, Hauk was asked about his ability to perform three different jobs: inspecting trucks, watching security monitors, and putting together small parts. In responding that he could not perform these jobs, Hauk referred mainly to his pain and impulse control problems, even though each suggested job is vision-intensive. Hauk's only reference to his vision occurred when the ALJ queried him about performing an inspector-type job. (Tr. 39). After Hauk replied that he would get too nervous and did not think he could put up with the people, the ALJ followed up with a question about whether Hauk could see to do the work. Even then, Hauk evaded the question, first mentioning his eye pain then saying his eyes get tired and his vision gets blurry. However, he did say he can see out of one eye at a time, which is confirmed by doctor's reports showing that Hauk has 20/20 vision in one eye and 20/30 in the other. (Tr. 167). The combination of this evidence provides the required support for the ALJ's finding that even though Hauk can no longer perform commercial driving jobs, his vision limitations "should not impact to any significant degree the number of jobs still available to claimant." (Tr. 21).

■ The final issue concerning the ALJ's review of Hauk's impairments is whether he sufficiently considered their total impact on Hauk's RFC, as mandated by Congress. 42 U.S.C. § 423(d)(2)(C). In his opinion, the ALJ first addressed Hauk's individual allegations of pain and other problems and determined that they were not credible to the extent alleged. The ALJ then found that "the combination of claimant's medically determinable vision and other alleged impairments is not of such severity to prevent him from performing most unskilled light work except for commercial driving jobs. This restriction should not significantly impact on the number of light work jobs available to claimant." (Tr. 22). Given these statements and the fact that substantial evidence supports the ALJ's individual findings, the Court is convinced that the ALJ properly analyzed the total effect of Hauk's impairments on his ability to perform light work.

Because the ALJ found that Hauk's complaints are exaggerated to the extent that they would preclude light work (which is the exertional level at which Hauk previously performed) and because this finding is supported by substantial evidence, reference to the grids was appropriate in this case. Thus, it follows that Hauk's third contention, that the ALJ failed in his duty to fully and fairly develop the record, is without merit.

**IT IS THEREFORE ORDERED** that in accordance with *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir.1994), *Plaintiff's Motion for Summary Judgment* (Doc. # 9), filed April 11, 1995, be and hereby is overruled; and that *Defendant's Motion for an Order Affirming the Commissioner's*

*Decision* (Doc. # 11), filed April 28, 1995, be and hereby is sustained.