**Luz Leida ORTIZ TORRES, Plaintiff,**

v.

**Carolyn W. COLVIN,[1] Commissioner, Social Security Administration, Defendant.**

**No. 6:10–cv–0656 (WGY).**

United States District Court, N.D. New York.

April 10, 2013.

---

1. Carolyn W. Colvin, the now-Acting Commissioner of the Social Security Administration ("SSA"), has replaced former SSA Commis-

sioner Michael J. Astrue in the caption. *See*   Fed.R.Civ.P. 25(d).

Louise Marie Tarantino, Empire Justice Center, Albany, NY, for Plaintiff.

Katrina M. Lederer, Suzanne M. Haynes, Social Security Administration, Office of Regional General Counsel, New York, NY, for Defendant.

## *DECISION and ORDER*

WILLIAM G. YOUNG, District Judge.[2]

### I. INTRODUCTION

The plaintiff, Luz Leida Ortiz Torres ("Ortiz"), moves to reverse or remand the decision to deny her Supplemental Security Income ("SSI") benefits by the Commissioner of the Social Security Administration (the "Commissioner"). Compl. 1, 4, ECF No. 1. Ortiz brings this action pursuant to 42 U.S.C. sections 405(g) and 1383(c). *Id.* at 1. Ortiz argues that the decision of the Administrative Law Judge (the "hearing officer") was not supported by substantial evidence, misapplied the Medical–Vocational Guidelines (the "Grid"), and failed to provide a full and fair hearing. *See* Pl.'s Br. 16–25, ECF No. 13. The Commissioner filed a motion for an order affirming his decision. Comm'r's Br. Resp. Pl.'s Br. 1, 25, ECF No. 17.

### II. PROCEDURAL POSTURE

Ortiz filed an application for SSI benefits on May 8, 2006. Admin. R. at 83. She alleged a disability beginning on August 18, 2004. *Id.* Ortiz's claim was denied by the Social Security Administration ("SSA") on February 5, 2007. *Id.* at 58. Ortiz filed a request for a hearing before a hearing officer on March 12, 2007. *Id.* at 62. The hearing took place on August 28, 2008. *Id.* at 21. The hearing officer denied Ortiz's claim on October 14, 2008. *Id.* at 20. That same day, Ortiz filed a request for an Appeals Council review. *Id.* at 53–56. The Appeals Council denied review of her claim on April 29, 2010. *Id.* at 1. Ortiz filed a timely appeal of the Commissioner's

2. Of the District of Massachusetts, sitting by designation.

decision with this Court on June 4, 2010, pursuant to 42 U.S.C. section 1383(c) and 42 U.S.C. section 405(g). Compl. 1.

## III. FACTUAL BACKGROUND

Ortiz was born in Puerto Rico in 1959. Admin. R. at 83, 251. She attended school until tenth grade. *Id.* at 106. Ortiz moved to New York around 1994. *Id.* at 406. Spanish is her primary language; she speaks and understands little to no English. *Id.* at 30, 100, 252. Ortiz worked as a machine operator in a factory in 1978 and 1979 but left that job when she became pregnant. *Id.* at 27–28, 101–02. She has occasionally worked as a babysitter and a house cleaner, but otherwise she primarily has been a homemaker. *Id.* at 252, 404. Ortiz suffers from degenerative disc disease, depression, hypertension, "alleged cardiac disease," diabetes, and has a history of kidney stones. *Id.* at 13–17.

### A. Claimed Physical Impairments
#### 1. Back Pain

Ortiz has complained to physicians about lower back pain. *See, e.g., id.* at 175, 311. Her treating physician, Dr. Hafeez Rehman ("Dr. Rehman") has prescribed pain medication to alleviate Ortiz's pain on several occasions, *id.* at 175, 181, 184, 185, 187, 191, as well as a Lidoderm patch, *id.* at 181, 336. Dr. Rehman, however, has noted that Ortiz often fails to take her prescribed pain medication. *Id.* at 185, 187, 350, 352, 356, 368.

On August 8, 2005, when Ortiz complained of lower back pain, Dr. Rehman noted degenerative joint disease with a disc protrusion at vertebra L5–S1. *Id.* at 181. On August 19, 2005, Ortiz went to the emergency room of a hospital complaining of severe lower back pain. *Id.* at 303. Physicians at the hospital diagnosed lumbago, told Ortiz to avoid heavy lifting, and gave her medication to alleviate the

pain. *Id.* at 307, 311. On May 11, 2006, Ortiz told Dr. Rehman that she experienced pain throughout the right side of her body and that she could not lift her right arm. *Id.* at 160. Dr. Rehman performed an examination that revealed tenderness in the right deltoid area, diagnosed subdeltoid bursitis, and gave Ortiz a shoulder injection to relieve the pain. *Id.* at 161. A computed tomography scan ("CT scan") of Ortiz on September 15, 2006, showed "a moderate degree of degenerative disc changes and osteoarthritis of L5–S1 with a mild degree of disc bulging." *Id.* at 383–84. An x-ray on November 9, 2006, showed mild anterior wedging of the T8, T9, T10, and T11 vertebrae, with a fifteen to twenty percent "loss of anterior height resulting in a progressive kyphosis."[3] *Id.* at 248.

At a December 5, 2007, visit, Dr. Rehman examined Ortiz and noted tenderness in the lumbar-sacral spinal area. *Id.* at 354. He further noted that flexion and extension of Ortiz's spine was "very limited due to pain." *Id.* There was also a "flattening of [the] lumbar curve." *Id.* Dr. Rehman ordered an x-ray of Ortiz, which revealed a left kidney stone, degenerative joint disease, and osteoarthritis of L5–S1. *Id.* at 353–54. In April 2008, Ortiz complained of neck pain and headaches. *Id.* at 350. Dr. Rehman's physical examination did not reveal any new conditions, and no test results were outside normal limits. *Id.*

On a Physical Capacities Evaluation, Dr. Rehman opined that Ortiz could sit for eight hours, stand for six hours, and walk for five hours out of an eight-hour work day. *Id.* at 393. He further opined that Ortiz occasionally could lift or carry ten pounds and frequently could lift or carry less than ten pounds. *Id.* Dr. Rehman opined that Ortiz would experience pain

---

**3.** This analysis was written by Dr. Pesho S. Kotval. *Id.* at 248.

upon lifting or carrying ten pounds or more. *Id.* Dr. Rehman further opined that Ortiz occasionally could reach, push, pull, and bilaterally use foot pedals. *Id.* Simple grasping and fine manipulation were not so limited. *Id.* Dr. Rehman opined that Ortiz could occasionally reach above shoulder level but said she ought never bend, stoop, squat, kneel, or crawl. *Id.* at 394. Finally, he opined that Ortiz could not work in extreme temperatures and humidity or around moving machinery, chemicals, dust, odors, fumes, and gases. *Id.* Otherwise, however, Ortiz could work around heights, noise, and vibration. *Id.*

On June 10, 2008, Dr. Jamshaid Minhas ("Dr. Minhas") examined Ortiz after Dr. Rehman referred Ortiz to him. *Id.* at 327–28. Dr. Minhas ordered an MRI of Ortiz's spine, which showed "L5–S1 mild degenerative disc disease with a moderate-sized broad-based, central disc protrusion, minimally eccentric to the right contacting the right S1 nerve root in the lateral recess without compression or displacement." *Id.* at 328. Dr. Minhas noted that this was "the only potential source, albeit subtle, for [Ortiz's] reported radiculopathy." *Id.* He further noted that there was "no significant nerve stenosis or nerve impingement at any other remaining levels." *Id.*

On January 31, 2007, disability examiner R. Thornton[4] ("Thornton") completed a Physical Residual Functional Capacity Assessment on Ortiz. *Id.* at 269–74. Thornton indicated that Ortiz occasionally could lift or carry twenty pounds, frequently could lift or carry ten pounds, could stand, walk, and sit for six hours in an eight-hour workday, and had an unlimited ability to push or pull. *Id.* at 270. Thornton stated

that these conclusions came from the evidence in Ortiz's file.[5] *Id.* at 273.

## 2. Pancreatitis

Dr. Edward S. Orris ("Dr. Orris"), a gastroenterologist, examined and treated Ortiz after Dr. Rehman's referral. *Id.* at 207–08. Dr. Orris had Ortiz undergo a magnetic resonance cholangiopancreatography and an endoscopic retrograde cholangiopancreatography in 2003. *Id.* The imaging studies revealed a large right renal cyst, *id.* at 234, and normal pancreatic ducts, *id.* at 242. A CT scan in February 2004 revealed chronic pancreatitis and a pancreatic pseudocyst. *Id.* at 204. Attempts at draining the pseudocyst endoscopically were initially unsuccessful. *See id.* at 202, 235–36, 238–41, 299. On March 23, 2005, Ortiz had a cholecystectomy and a pancreatic cyst gastrostomy performed surgically, which successfully drained the pancreatic cyst. *Id.* at 299. Dr. Orris has noted chronic pancreatitis in Ortiz and that Ortiz's mother died of pancreatic cancer. *Id.* at 199.

## 3. Kidney Stones

Dr. Bipin G. Patel ("Dr. Patel"), a nephrologist, examined and treated Ortiz from 2006 until 2008. *See id.* at 408–71. Dr. Patel diagnosed Ortiz with kidney stones on October 17, 2006. *Id.* at 443. A June 5, 2007, ultrasound of Ortiz's kidneys revealed "mild central collecting system dilatation on the right" kidney and a seven-millimeter calculus on the left kidney. *Id.* at 370. A December 14, 2007, ultrasound of Ortiz's kidneys revealed that "right and left renal artery flow velocities [were] within normal limits with no evidence of stenosis" and that both kidneys

---

**4.** R. Thornton's first name is not in the record.

**5.** Thornton's opinion appears to rely in part on a report from Dr. Phillip Gilly ("Dr. Gilly") but varies from Dr. Gilly's conclusions.

*Id.* at 273. The hearing officer did not give weight to Dr. Gilly's opinion "because he is no longer considered an acceptable medical source." *Id.* at 19. For this same reason, this Court will not list Dr. Gilly's findings.

were within normal size limits. *Id.* at 458. A third ultrasound on July 8, 2008, showed a non-obstructing stone on the left kidney. *Id.* at 345. Dr. Patel has noted that Ortiz missed several appointments. *See, e.g., id.* at 410, 424, 427, 430, 431, 434, 441, 446.

### 4. Cardiac Health

A February 15, 2005, examination of Ortiz's heart showed normal heart sounds and no gallops or murmurs. *Id.* at 294. A February 16, 2005, electrocardiogram report showed "normal global left ventricular systolic function with mild concentric left ventricular hypertrophy." *Id.* at 293. A February 27, 2007, x-ray revealed "no radiographic evidence of acute cardiopulmonary disease." *Id.* at 485. In January 2008, Dr. Patel ordered a twenty-four-hour Holter monitor, which showed unremarkable results and "no significant ventricular arrythmia or atrial arrythmia." *Id.* at 457.

## B. Mental Health

### 1. Treating Physicians

On October 17, 2006, Dr. Nagaraj Jajoor ("Dr. Jajoor"), a psychiatrist, assessed Ortiz's mental health. *Id.* at 406-07. Dr. Jajoor noted complaints and symptoms of depression, including poor sleep, poor appetite, difficulty being in social situations, difficulty concentrating, and anxiety. *Id.* Ortiz reported hearing loud noises and feelings of anxiousness, although she denied having any suicidal thoughts. *Id.* at 406. Ortiz stated she had previously been treated for depression when she was eighteen or nineteen, with suicidal ideation at that time. *Id.* Ortiz also reported flashbacks to when she was briefly abducted as a young child. *Id.* at 406-07. Dr. Jajoor examined Ortiz and noted that Ortiz was cooperative, had normal behavior, good eye contact, clear speech, full orientation, no hallucinations or delusions, a depressed affect, intact memory, and average intelligence. *Id.* at 407. Dr. Jajoor ultimately diagnosed Ortiz with dysthymic disorder [6] and assessed a Global Assessment of Functioning ("GAF") score of 45.[7] *Id.* at 407.

On February 1, 2007, Dr. Fabio Urresta ("Dr. Urresta"), another psychiatrist, also assessed Ortiz's mental health. *Id.* at 403-05. Ortiz reported feeling headaches, tension, visual and auditory hallucinations, and depression, but no suicidal or homicidal ideations. *Id.* at 403-04. Ortiz stated that she had suffered from a depressed mood, decreased appetite, sleep problems, low energy, poor concentration, and low self-esteem. *Id.* at 403. She stated that she had attempted suicide once as a teenager. *Id.* On examination, Dr. Urresta noted that Ortiz's psychomotor activity was slow and that her eye contact was fair. *Id.* at 404. He also noted that Ortiz's mood was somewhat depressed, that her affect was constricted, that she was alert and fully oriented, that she had fair insight and judgment, that she had no auditory or

---

6. Dysthymic disorder is characterized by "chronically depressed mood that occurs for most of the day more days than not for at least 2 years." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 376 (4th ed. 2000) [hereinafter DSM–IV–TR]. "During periods of depressed mood, at least two of the following additional symptoms are present: poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness." *Id.*

7. This score refers to a "clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment and measuring its impact, and in predicting outcome." DSM–IV–TR at 32. The GAF scale ranges from 1 to 100; the higher the number, the higher the level of functioning it describes. "A GAF range of 41–50 indicates that the individual has a 'serious impairment in one of the following: social, occupational, or school functioning.'" *Pollard v. Halter*, 377 F.3d 183, 186 n. 1 (2d Cir.2004).

visual hallucinations, and that her speech, in Spanish, was fluent. *Id.* Dr. Urresta diagnosed major depressive disorder [8] that was mild and recurrent, ruled out dysthymic disorder, ruled out social phobia, ruled out dependent personality disorder, and assigned a GAF score of 45. *Id.* at 404–05. Dr. Urresta prescribed Zoloft to treat depression and increased the dosage at a later visit because Ortiz reported not feeling better with the original dosage. *Id.* at 402.

On May 31, 2007, Ortiz met with Dr. Jacqueline Pasco ("Dr. Pasco"), another psychiatrist, as a follow-up. *Id.* at 400–01. Ortiz reported feelings of depression and tension and also stated that she would forget where she placed her medication and would then not take her medication. *Id.* at 400. Ortiz again complained of hearing voices and noises. *Id.* Dr. Pasco concurred with the previous diagnosis of major depressive disorder that was recurrent and mild, ruled out dysthymic disorder, and ruled out social phobia. *Id.* Dr. Pasco prescribed citalopram for depression and Vistaril for anxiety and sleep but noted that it was "highly suspicious that there are compliance issues in question." *Id.* at 400–01.

In November 2007, Ortiz saw Dr. Pasco again. *Id.* at 399. Ortiz indicated that she had no energy, felt tired most of the time, and also felt agitated and anxious. *Id.* She confided to Dr. Pasco that she was afraid of her primary care physician, Dr. Rehman, because Dr. Rehman would scold her, although she reasoned that he did so "perhaps to emphasize the need for continued follow up and compliance with medication" *Id.* Ortiz also stated that finding transportation to visit with medical personnel was difficult. *Id.* Ortiz again indicated that she

heard voices which, at times, would be loud. *Id.*

Ortiz saw Dr. Pasco again on February 4, 2008. *Id.* at 397–98. Ortiz said that when she took her medications, she felt less anxious and depressed, and the voices were more distant and easier to ignore. *Id.* at 397. Dr. Pasco noted that Ortiz still had some medication from previous prescriptions, suggesting that Ortiz was not taking her medication regularly. *Id.* According to Dr. Pasco, Ortiz stated that "the last time she took these medications was last week, [and] that she still had medications from prior prescriptions." *Id.* Ortiz appeared to be taking other medications properly. *Id.* Ortiz indicated that her sleep and appetite had improved but that visiting doctors in general made her anxious. *Id.*

On March 28, 2008, Dr. Pasco examined Ortiz and determined that there were no episodes of hallucination and no suicidal or homicidal thoughts and that Ortiz had fair judgment and fair impulse control, but poor insight. *Id.* at 396. Ortiz indicated that she had lost the purse which contained her medications, and therefore she had not taken them. *Id.*

At a June 20, 2008, visit, Ortiz reported feeling very depressed due to her son's incarceration. *Id.* at 395. Her appetite and sleep were poor; her depression was worse; and she had "thoughts of wanting to die, but she does not want to die." *Id.* Ortiz requested a change in medication, which Dr. Pasco granted, but Dr. Pasco noted that she "was not sure if [Ortiz] is truly compliant with her [medication]." *Id.*

---

**8.** Major depressive disorder is characterized by one or more major depressive episodes, DSM–IV–TR at 369, which are "period[s] of at least 2 weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities," *id.* at 349.

## 2. Consulting Physicians

At the request of the SSA, Ortiz saw Dr. Marcos Nieves ("Dr. Nieves"), a psychiatrist, on December 29, 2006. *Id.* at 251–52. Ortiz reported a history of depression with sleep problems, lack of motivation, frequent crying, social isolation, memory problems, low energy, lack of appetite, frequent headaches, and intrusive memories and flashbacks of her childhood abduction. *Id.* at 251. Ortiz also mentioned suicidal ideas and death wishes but denied an intent to harm herself or others. *Id.* at 252. Ortiz also indicated that, because of transportation issues, she had difficulty picking up prescribed medication, as well as generally taking her medication. *Id.* at 251.

On examination, Dr. Nieves noted that Ortiz was tense, had a depressed mood, congruent affect, and intelligence in "the low average to borderline range," with an inability to perform simple calculations. *Id.* at 252. Dr. Nieves further noted that Ortiz was fully oriented, had no delusions, and exhibited fully coherent speech in Spanish. *Id.* Dr. Nieves diagnosed post traumatic stress disorder, dysthymia, and personality disorder. *Id.* Dr. Nieves recommended pharmacologic treatment and counseling. *Id.* He concluded that "[p]rognosis for full time employment appears very poor. She would need a representative payee if benefits were granted to her." *Id.*

Dr. J. D'Ambrocia ("Dr. D'Ambrocia")[9] completed a Psychiatric Review Technique form on January 31, 2007. *Id.* at 255–68. It does not appear that Dr. D'Ambrocia ever examined Ortiz personally. Dr. D'Ambrocia opined that Ortiz had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence,

and pace, but no repeated episodes of deterioration of extended duration. *Id.* at 265. Dr. D'Ambrocia also completed a Mental Residual Functional Capacity Assessment, *id.* at 275–77, and found moderate limitations on Ortiz's ability to maintain extended attention and concentration and moderate limitations on her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, *id.* at 275. Furthermore, he found moderate limitations on her ability to complete a workday and workweek without interruptions from psychologically based symptoms and to do so at a consistent pace without unreasonable rest periods. *Id.* at 276. Finally, he noted moderate limitations on her ability to respond appropriately to changes in the work setting. *Id.* Dr. D'Ambrocia opined that, otherwise, Ortiz was not significantly limited. *Id.* at 275–77.

## IV. LEGAL STANDARD

### A. Standard of Review

This Court has the power to affirm, modify, or reverse the decision of the Commissioner. 42 U.S.C. § 405(g). This Court makes its decision based on the parties' pleadings and the administrative record. *Id.* When reviewing the Commissioner's decision, this Court must sustain the Commissioner's conclusion "if it is supported by 'substantial evidence' on the record as a whole." *Gold v. Sec'y Health, Educ. & Welfare,* 463 F.2d 38, 41 (2d Cir. 1972). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003) (quoting *Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000), *superseded by regulation on*

---

**9.** Dr. D'Ambrocia's first name is not in the record. He holds a Ph.D. in psychology. *Id.* at 255.

*other grounds,* 20 C.F.R. § 404.1560(c)(2), *as recognized in Douglass v. Astrue,* 496 Fed.Appx. 154, 156 (2d Cir.2012)). Thus, substantial evidence requires "more than a mere scintilla." *Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)) (internal quotation mark omitted).

Before determining whether the Commissioner's decision was supported by substantial evidence, a court must decide whether the Commissioner "applied the correct legal principles." *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987). When the Commissioner applies incorrect legal principles, substantial evidence alone will not suffice. *See id.* at 986. If the Commissioner applies the incorrect legal principles, this Court may affirm the decision only if the "application of the correct legal principles to the record could lead to only one conclusion." *Id.* In such a case, "there is no need to require agency reconsideration." *Id.*

### B. Social Security Disability Standard

A person is considered disabled if he or she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The SSA has promulgated a five-step sequential analysis to determine whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v). This analysis requires a hearing officer to determine (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a medically severe impairment; (3) whether the impairment meets or medically equals an impairment listed

under 20 C.F.R. Part 404, Subpart P, Appendix 1, and meets the duration requirement; (4) whether the claimant has the residual functional capacity to perform his past relevant work; and (5) whether the impairment prevents the claimant from doing any other work considering the claimant's age, education, and work experience. *See id.; see also Green–Younger,* 335 F.3d at 106. The claimant bears the burden in the first four steps to show that he or she is disabled within the meaning of the Social Security Act. *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996). At the fifth step, the burden shifts to the Commissioner, and the Commissioner must show that "there is other gainful work in the national economy which the claimant could perform." *Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002) (quoting *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983)) (internal quotation mark omitted).

### V. THE HEARING OFFICER'S DECISION

At the first step, the hearing officer determined that Ortiz had not engaged in any substantial gainful activity since the date of her application, May 8, 2006. Admin. R. at 13.

At the second step, the hearing officer determined that Ortiz had, as severe impairments, degenerative disc disease and depression. *Id.* The hearing officer determined that Ortiz's hypertension, cardiac disease, diabetes, and kidney stones were not severe impairments because they were well-controlled by treatment and medication. *Id.* at 13–14.

At the third step, the hearing officer determined that Ortiz's degenerative disc disease and depression did not meet or equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 14. The hearing officer determined

that the evidence in the record supported findings of "no more than mild restriction in activities of daily living," *id.*, moderate difficulties in maintaining social functioning, *id.* at 15, mild difficulties in maintaining concentration, persistence, and pace, *id.*, and that there were no episodes of decompensation, *id.*

At the fourth step, the hearing officer determined that Ortiz "has the residual functional capacity to perform light work." *Id.* The hearing officer described the .demands of light work, such as the ability to lift no more than a maximum of twenty pounds as well as frequently lifting or carrying up to ten pounds, and determined that based on evidence in the record, Ortiz could perform a full range of light work. *Id.* at 16–17.

The hearing officer's decision indicates that he considered the underlying medical evidence in the record when determining how much of Dr. Rehman's opinion to adopt. *See id.* at 17. The hearing officer noted that x-rays of Ortiz "revealed mild to moderate degrees of degenerative changes involving the L5 and S1 vertebrae." *Id.* He also noted the MRI that "indicated a moderate sized broad based central disc protrusion" and that "[t]he protrusion is contacting the S1 nerve root but without compression or displacement." *Id.*

The hearing officer noted that when Ortiz went to the emergency room for back pain, her treatment was considered by medical staff to be "routine and conservative in nature." *Id.* The hearing officer further noted that "[Ortiz's] back has not required surgical intervention, injection therapy, or physical therapy." *Id.*

As for Ortiz's mental limitations, the hearing officer found these "not fully credible." *Id.* He acknowledged some evidence "for the existence of depression but not for the degree of limitations alleged." *Id.* Particularly, he was skeptical of the "spo-

radic treatment history for this allegedly disabling impairment." *Id.*

The hearing officer was also suspicious of Ortiz's testimony at the hearing. *See id.* at 18. During her testimony, the hearing officer noted that "it was very difficult to elicit testimony from [Ortiz]" and that "[Ortiz] did not maintain eye contact, spoke very softly and often did not answer the questions posed but responded with irrelevant information pertaining to a different question." *Id.* The hearing officer concluded that this behavior "was an exaggerated presentation as it [was] totally inconsistent with the rest of the record." *Id.* The hearing officer considered Ortiz's testimony in concluding that she "does not have mental limitations which would significantly narrow the range of light works [she] could still perform." *Id.*

At the fifth step, the hearing officer applied the Grid and determined that, based on Ortiz's age, education, experience, and residual functional capacity, there existed jobs in significant numbers in the national economy that Ortiz could perform. *Id.* at 19. The hearing officer therefore concluded that Ortiz had not been disabled since May 8, 2006. *Id.*

## VI. ANALYSIS

Ortiz faults three aspects of the hearing officer's determinations. First, she argues that the hearing officer's residual functional capacity finding was not supported by substantial evidence. Pl.'s Br. 16–20. Second, she argues that the hearing officer misapplied the Grid. *Id.* at 21–22. Third, she argues that Ortiz was not provided with a full and fair hearing. *Id.* at 22–25.

### A. The Residual Functional Capacity Finding

Ortiz argues that the hearing officer's residual functional capacity finding was erroneous regarding both her physical capa-

bilities, *id.* at 16–19, and her mental capabilities, *id.* at 19–20. A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). A residual functional capacity assessment considers exertional and nonexertional capacities. SSR 96–8p, 1996 WL 374184, at *5 (July 2, 1996). Exertional capacity refers to a claimant's "limitations and restrictions of physical strength" in performing activities such as "[s]itting, standing, walking, lifting, carrying, pushing, and pulling." *Id.* "Nonexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength," such as hearing instructions and responding appropriately to supervision. *Id.* at *6.

The hearing officer must consider both objective facts from medical records as well as the claimant's own statements. 20 C.F.R. § 416.945(a)(3). This Court recognizes that "[i]t is the function of the [hearing officer], not [this Court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir.1984) (quoting *Carroll*, 705 F.2d at 642) (internal quotation marks omitted). "Similarly, while the opinions of a treating physician deserve special respect, . . . genuine conflicts in the medical evidence are for the [hearing officer] to resolve." *Id.* (citations omitted).

### 1. The Physical Residual Functional Capacity Finding

Ortiz argues that the hearing officer erroneously determined that she has the residual functional capacity for a full range of light work. Pl.'s Br. 17–19. The hearing officer referenced Dr. Rehman's opinion as stating that Ortiz could sit for up to eight hours, stand for up to six hours, and walk for up to five hours in an eight-hour work day; that Ortiz could oc-

casionally lift ten pounds and frequently lift and carry less than ten pounds; that she could perform simple grasping and fine manipulation frequently; that she could occasionally reach, including above shoulder level, use foot pedals, and push or pull; and that Ortiz ought not bend, stoop, squat, kneel, or crawl. Admin R. at 17. Based on these findings, the hearing officer concluded that "this opinion is generally consistent with the demands of light work except for the amount of lifting[,] carrying and occasional bending and stooping that might be required." *Id.* The hearing officer then pivoted away from accepting Dr. Rehman's findings:

> However[,] the medical record does not support this opinion and, to the extent that Dr. Rehman's opinion is inconsistent with a full range of light work, it can be accorded minimal weight. [Ortiz] has not undergone surgical intervention, injection therapy, or physical therapy. Objective clinical findings have been essentially normal. I find that the claimant has the ability to lift up to 10 pounds frequently and 20 pounds occasionally as well as the ability to perform occasional bending and stooping. Thus, she has the residual functional capacity to meet the exertional demands of light work.

*Id.* Essentially, the hearing officer rejects portions of the treating physician's opinion suggesting that Ortiz could occasionally lift up to ten pounds and that she ought not bend or stoop. *Compare id., with id.* at 393–94. The hearing officer concludes that the medical record does not support the treating physician's opinion but offers only two short sentences for substituting his finding. *Id.* at 17 ("[Ortiz] has not undergone surgical intervention, injection therapy, or physical therapy. Objective clinical findings have been essentially normal.").

■ It is the hearing officer's role to weigh evidence and resolve evidentiary conflicts. *Aponte,* 728 F.2d at 591. A hearing officer, however, cannot discount a treating physician's opinion because the physician has "recommended a conservative treatment regimen." *Burgess v. Astrue,* 537 F.3d 117, 129 (2d Cir.2008). Nor can a hearing officer impose his or her own views of what ought be the proper treatment regimen. *See id.; see also Shaw v. Chater,* 221 F.3d 126, 134–35 (2d Cir.2000) (rejecting a hearing officer's decision that "imposed [its own] notion that the severity of a physical impairment directly correlates with the intrusiveness of the medical treatment ordered").

The hearing officer's decision can be mined for some other support that Ortiz's condition was not as intense or persistent as alleged. For example, the hearing officer noted that when Ortiz went to the emergency room for back pain, her treatment was considered by medical staff to be "routine and conservative in nature." Admin R. at 17. The emergency room staff also provided "instruction and medication" to Ortiz, according to the hearing officer. *Id.* If a claimant only took over-the-counter medication to manage her pain, a hearing officer could use this fact in conjunction with other substantial medical evidence to help support a conclusion that she was not disabled. *Burgess,* 537 F.3d at 129. Ortiz, however, was prescribed hydrocodone for her back pain by Dr. Rehman. Admin R. at 17.

When reviewing the objective clinical findings that the hearing officer called "essentially normal," this Court is puzzled by that conclusion based on the evidence that the hearing officer reviewed and credited. The hearing officer noted that multiple x-rays of Ortiz's back "revealed mild to moderate degrees of degenerative changes involving the L5 and S1 vertebrae." *Id.* He also acknowledged an MRI that "indicated a moderate sized broad based central disc protrusion" which "is contacting the S1 nerve root but without compression or displacement." *Id.* The hearing officer also reiterated Dr. Minhas's opinion that the contact between the disc protrusion and the S1 nerve root "may be a potential source, albeit subtle, for claimant's reported radiculopathy." *Id.*

■ A hearing officer is required to provide reasons when a treating physician's opinion is not given controlling weight. *Burgess,* 537 F.3d at 129; 20 C.F.R. § 404.1527(c)(2). The hearing officer must consider several factors, including the "[l]ength of the treatment relationship and the frequency of examination," 20 C.F.R. § 404.1527(c)(2)(i), the "[n]ature and extent of the treatment relationship," *id.* § 404.1527(c)(2)(ii), "[s]upportability" of the opinion through medical evidence and objective laboratory findings, *id.* § 404.1527(c)(3), consistency of the opinion with the record, *id.* § 404.1527(c)(4), whether the opinion comes from a specialist, *id.* § 404.1527(c)(5), and any other relevant factors, *id.* § 404.1527(c)(6). The hearing officer also "must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess,* 537 F.3d at 129 (alteration in original) (quoting *Halloran v. Barnhart,* 362 F.3d 28, 33 (2d Cir.2004) (per curiam)). Finally, "a circumstantial critique by non-physicians, however thorough or responsible, must be overwhelmingly compelling in order to overcome a medical opinion." *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 862 (2d Cir.1990).

The hearing officer's stated reasons are simply insufficient under the standard set forth by the regulations and the Second Circuit. The hearing officer ought not have relied so heavily on Ortiz's treatment regimen and must provide more comprehensive reasons for rejecting portions of

Dr. Rehman's opinion regarding Ortiz's physical limitations while crediting others. This Court expresses no opinion on Ortiz's actual physical capabilities but merely holds that the hearing officer's explanation for disregarding the limitations imposed by Dr. Rehman is not legally sufficient. On remand, the hearing officer must provide a more comprehensive explanation.

## 2. The Mental Residual Functional Capacity Finding

■ Ortiz argues that the hearing officer did not properly assess her mental residual functional capacity because the hearing officer did not discuss her GAF score and ignored certain evidence from Dr. Pasco, Dr. Nieves, and Dr. D'Ambrocia. Pl.'s Br. at 19–20.

The SSA has stated that the GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings." Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,-746, 50,764–65 (Aug. 21, 2000). While one magistrate judge in this district criticized a hearing officer who failed to discuss GAF scores, see LaFreniere v. Astrue, No. 09–CV-167 (GTS/VEB), 2010 WL 3808566, at *5 (N.D.N.Y. July 27, 2010) (Bianchini, M.J.), another magistrate judge within the Second Circuit has deemed a GAF score to be but "one factor" that a hearing officer ought consider in his determination, Carrigan v. Astrue, No. 2:10–cv–303, 2011 WL 4372651, at *6 (D.Vt. Aug. 26, 2011) (Conroy, M.J.) (quoting Parker v. Comm'r of Soc. Sec. Admin., No. 2:10–CV–195, 2011 WL 1838981, at *6 (D.Vt. May 13, 2011) (Conroy, M.J.)) (internal quotation marks omitted). In a similar vein, the Sixth Circuit does not require remand when a hearing officer fails to discuss the score of a claimant. Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir.2002) ("While a GAF score may be of considerable help to the [hearing officer] in formulating the

[residual functional capacity], it is not essential to [its] accuracy. Thus, ... failure to reference the GAF score in the [residual functional capacity], standing alone, does not make the [residual functional capacity] inaccurate."). This Court rules that the hearing officer's failure to discuss the scores does not constitute an error worthy of remand.

Ortiz's arguments regarding evidence from Dr. Nieves, Dr. Jajoor, Dr. Pasco, Dr. Urresta, and Dr. D'Ambrocia, see Pl.'s Br. 19–20, are unavailing. It is ultimately the hearing officer's role to weigh conflicting evidence. Aponte, 728 F.2d at 591. Dr. Nieves diagnosed post traumatic stress disorder, dysthymia, and personality disorder. Admin R. at 252. Dr. Jajoor diagnosed dysthymic disorder. Id. at 407. Dr. Pasco ruled out dysthymic disorder and social phobia while diagnosing mild, recurrent major depressive disorder. Id. at 400. Finally and similarly, Dr. Urresta ruled out dysthymic disorder, social phobia, and dependent personality disorder while also diagnosing mild, recurrent major depressive disorder. Id. at 404–05.

The hearing officer took such disparate diagnoses, combined them with his own observations of Ortiz and credibility finding, and concluded that while "[t]he record provides some support for the existence of depression," id. at 17, that depression is not of a disabling degree. See id. at 17–18. Such a conclusion is supported by substantial evidence, such as treatment notes from Dr. Jajoor that describe Ortiz as being fully oriented, with normal appearance and behavior, a cooperative attitude, good eye contact, and clear speech, id. at 407, Dr. Urresta's description stating that Ortiz was alert and fully oriented and had fair insight and judgment, id. at 404, and Dr. Nieves's depiction of Ortiz as normal in behavior with full orientation, coherent speech, and without delusions, id.

at 252. Moreover, while Ortiz cites limitations stated by Dr. D'Ambrocia regarding difficulties she would have relating to others and adapting to changes in a workplace, Pl.'s Br. 20 (citing Admin. R. at 275–77), Dr. D'Ambrocia apparently did not have access to Ortiz's treatment records, Admin R. at 18–19. As a result, the hearing officer gave "minimal" weight to the opinion while also noting that Dr. D'Ambrocia stated that Ortiz "had retained adequate activities of daily living overall, including those with cognitive involvement, as well as having the ability to understand and remember instructions and sustain attention and concentration for tasks." *Id.* at 19.

Finally, Ortiz relies on a statement by Dr. Nieves that the "prognosis for full time employment appeared very poor." Pl.'s Br. 20. It is the hearing officer, and not a physician, who must determine whether a claimant is disabled. *See Bennett v. Astrue,* No. 07–CV–0780 (NAM), 2010 WL 3909530, at *3 (N.D.N.Y. Sept. 30, 2010) (Mordue, C.J.) ("A treating physician's belief that a plaintiff is 'totally disabled' is irrelevant since that determination is reserved for the [hearing officer].").

Substantial evidence exists to support the hearing officer's determination of Ortiz's mental residual functional capacity, and therefore this portion of the hearing officer's determination must be upheld. *See Green–Younger,* 335 F.3d at 106; *Gold,* 463 F.2d at 41.

## B.  Applying the Grid Rules

Ortiz argues that the hearing officer misapplied the Grid rules, contending that the hearing officer improperly failed to consider Ortiz's nonexertional impairments. Pl.'s Br. 21–22. In light of this Court's remand for the hearing officer to reevaluate Ortiz's residual physical functional capacity, there is no need for this Court to address this issue.

## C.  The Hearing

Ortiz argues that she did not receive a full and fair hearing. *Id.* at 22–25. She claims that the hearing fell short of due process requirements because the hearing record is inadequate due to issues with the interpreter, *id.* at 23, and because the hearing officer's adverse credibility determination of Ortiz was without merit, *id.* at 23–25.

### 1.  The Spanish Interpreter

At the hearing, the interpreter performed his job by telephone rather than in person. *See* Admin. R. at 23–52. Due to an apparent equipment issue, the interpreter sometimes had difficulty in hearing Ortiz's responses and needed her to repeat her answers. *See, e.g., id.* at 25, 26, 28–29, 31–32, 33, 36–39. Ortiz's attorney, at times, corrected a response given by the interpreter, supplemented the response further, or communicated her client's response entirely. In one instance, Ortiz's attorney asked Ortiz when she began seeing a therapist, to which the interpreter responded "I don't know," and the attorney stated, "She actually said I don't remember, but anyway." *Id.* at 33. In another instance, the hearing officer asked Ortiz about side effects of medication, to which the interpreter responded that Ortiz experienced headaches and Ortiz's attorney indicated that she thought she also heard vomiting. *Id.* at 37–38. In a third instance, when Ortiz's attorney asked Ortiz whether she had seen a neurologist for headaches, the interpreter could not hear the answer, and the attorney stated that she had seen a physician named Dr. Binjos. *Id.* at 43.

While the difficulties caused by the equipment used are troubling to this Court, Ortiz fails to allege specific instances of mistranslations or lack of understanding that produce an unfair hearing. The hearing officer and Ortiz's counsel

were otherwise able to elicit useful testimony from Ortiz, such as what issues she was experiencing, *id.* at 34, what medication she was taking, *id.* at 35–36, side effects of the medication, *id.* at 37–38, daily activities, *id.* at 39, 41, problems with following directions and feelings of anxiousness, *id.* at 42–43, describing the severity of abdominal pain, *id.* at 45, and noting pain experienced when standing, sitting, or lifting objects, *id.* at 46. Ortiz experienced some difficulties with the interpreter, but the specific mistranslations and subsequent corrections that did occur at Ortiz's hearing had little prejudicial impact on Ortiz. *See Tankisi v. Comm'r of Soc. Sec.,* 847 F.Supp.2d 513, 517 (W.D.N.Y.2012) (Larimer, J.) (reasoning that despite "difficult[ies] hearing one another" among all videoconference participants and a telephonic interpreter and other translation issues, there was no deprivation of "a full and fair opportunity to establish [claimant's] disability claim at the hearing"). The failures of the transcript and translation during the hearing do not constitute a deprivation of a full and fair hearing. While an additional hearing is not needed in this case, the hearing officer ought hold such a hearing if necessary to further supplement his findings for the residual functional capacity reevaluation.

### 2. The Credibility Determination

■ Ortiz argues that the hearing officer's adverse credibility finding is without merit because the hearing officer's decision "is rife with factual inaccuracies that call into question the legitimacy of his findings," because the hearing officer improperly believed that Ortiz's behavior at the hearing was "exaggerated," because the hearing officer did not inquire into Ortiz's work history, and because the hearing officer placed too much weight on the fact that Ortiz did not fully comply with medication and attending appointments. Pl.'s Br. 24–25.

The discrepancies that Ortiz refers to are that the hearing officer stated that "[Ortiz's] claim was denied on reconsideration [on February 5, 2007] when none was filed," *id.* at 24 (citing Admin. R. at 11), that the hearing officer misidentified Dr. Patel as a cardiologist rather than a nephrologist, *id.* at 24 (citing Admin. R. at 13–14), and that the hearing officer miscalculated Ortiz's age, *id.* (citing Admin. R. at 19). This Court views these errors as *de minimis* and not prejudicial to Ortiz. On February 5, 2007, it was Ortiz's initial claim that was denied by the SSA. Admin. R. at 58. Regarding the misidentification of Dr. Patel, a possible explanation is that Dr. Patel oversaw some of Ortiz's heart examinations. *See, e.g., id.* at 485. Miscalculating Ortiz's age as forty-four years old rather than forty-nine years old did not affect the outcome of the hearing officer's decision as Ortiz would still be considered a "younger individual" according to the SSA. *See* 20 C.F.R. § 416.963(c).

Regarding Ortiz's "exaggerated" appearance, she argues that the hearing officer does not indicate what behavior he believed Ortiz exhibited that resulted in a negative credibility finding. Pl.'s Br. 24. The hearing officer states in his decision that Ortiz "did not maintain eye contact, spoke very softly, and often did not answer the questions posed but responded with irrelevant information or information pertaining to a different question." Admin. R. at 18. The hearing officer further states that her behavior was inconsistent with evidence in the record, such as treatment notes with psychiatrists. *Id.*

This Court acknowledges what appears to be a shortcoming by the hearing officer in not inquiring further into Ortiz's work history. The hearing officer noted that Ortiz told Dr. Nieves that she had previously worked as a domestic worker, and the hearing officer further stated that Or-

tiz has not reported and has denied this work. *Id.* As argued by Ortiz, the hearing officer ought have inquired further into this issue if he had questions regarding Ortiz's work history.[10] Pl.'s Br. 24. In consideration of other evidence, however, these supposed errors do not warrant remand.

The hearing officer was entitled to draw a negative inference from Ortiz's lack of compliance with medication and treatment. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983) ("Of course, a remediable impairment is not disabling."); *see also* 20 C.F.R. § 416.930(a) ("In order to get benefits, [a claimant] must follow treatment prescribed by [the claimant's] physician if this treatment can restore [the claimant's] ability to work.").

The SSA recognizes that there are justifiable reasons for not following prescribed treatment. 20 C.F.R. § 416.930(c). "[E]xamples of a good reason for not following treatment" include (1) that specific medical treatment is contrary to a claimant's established teachings or religion; (2) the prescribed treatment is cataract surgery for one eye and the other eye already has an impairment that cannot be improved by further treatment; (3) a previous surgery for the same impairment was unsuccessful and a new surgery is prescribed for the same impairment; (4) the treatment is enormously risky; and (5) the treatment is amputation of a major portion or all of an extremity. *Id.*

Here, the reasons for Ortiz's lack of compliance and inability to attend sessions with physicians were forgetfulness and transportation issues, as well as anxiety when visiting Dr. Rehman. *See* Admin. R. at 251, 368, 399, 400. On one occasion she lost the purse containing her medications and thus was unable to take them. *Id.* at

396. A claimant must bear some responsibility in carrying out what his or her physicians request in an effort to remedy the claimant's issues. *See Dumas,* 712 F.2d at 1553. Ortiz's anxiousness at seeing Dr. Rehman would likely be obviated if she were compliant with prescribed medications. On several occasions, Ortiz did not take prescribed medications. *See, e.g.,* Admin. R. at 185–87, 350, 356, 368, 400. Ortiz also did not follow Dr. Pasco's instructions to connect with a therapist to address her depression and anxiety. *Id.* at 396.

There is substantial evidence to support the hearing officer's determination as to credibility.

## VII. CONCLUSION

For the reasons stated above, this Court VACATES IN PART AND REMANDS the decision of the Commissioner in order for the Commissioner to perform a more comprehensive physical residual functional capacity assessment and thereafter, if appropriate, to apply the Grid. In all other respects, this Court AFFIRMS the Commissioner's decision.

**IT IS SO ORDERED.**

---

10. The hearing officer did in fact ask what work Ortiz had done after being a factory worker, but the given answer was a continued explanation of why Ortiz stopped working at the factory, with some translation issues. *Id.* at 28.